IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WILLIAM DeFORTE and          )
EVAN TOWNSEND,               )
                             )
         Plaintiffs,         )     2:13-cv-00356
                             )     2:13-cv-00357
         v.                  )
                             )     Chief Judge Mark R. Hornak
BOROUGH OF WORTHINGTON       )
and KEVIN FEENEY,            )
                             )
         Defendants.         )

## OPINION

**Mark R. Hornak, Chief United States District Judge**

Pending before the Court are Defendants' Motion for Summary Judgment as to Plaintiff William DeForte (ECF No. 165) and Defendants' Motion for Summary Judgment as to Plaintiff Evan Townsend (ECF No. 167).[1] For the reasons explained below, the Court will GRANT the Motion for Summary Judgment as to Plaintiff DeForte, GRANT the Motion for Summary Judgment as to Plaintiff Townsend in part, specifically as to Plaintiff Townsend's federal claim, and will dismiss Plaintiff Townsend's state law claims without prejudice.

## I.   BACKGROUND

### a.   Parties and Claims

Plaintiffs William DeForte ("DeForte") and Evan Townsend ("Townsend") are former Borough of Worthington, (PA) police officers. (ECF No. 164 ¶¶ 4, 40, 41.) Plaintiffs each filed a Second Amended Complaint ("SAC") on February 18, 2014 (ECF Nos. 42, 43), and those SACs

---

[1] The Court previously consolidated the cases at 13-cv-356 and 13-cv-357 at docket number 13-cv-356. (ECF No. 20.) All specific docket citations in this Order refer to the 13-cv-356 docket.

are the operative Complaints in this case. Each SAC includes three Counts: (1) violation of Plaintiffs' procedural due process rights under the U.S. Constitution by Defendant Borough of Worthington ("the Borough") (Count One); (2) violation of the Pennsylvania Whistleblower Law by the Borough (Count Three); and (3) tortious interference with Plaintiffs' business relations by Defendant Kevin Feeney ("Feeney"), former mayor of the Borough (ECF No. 164 ¶ 4) (Count Four). (ECF Nos. 42, at 8–15; 43, at 5–10.)[2]

These claims stem from Defendants' alleged wrongdoing in connection with the termination of Plaintiffs' employment as Borough police officers. (*See generally* ECF Nos. 42, 43.) Plaintiffs' employment as Borough police officers was terminated on November 5, 2012 without prior notice or hearings. (ECF Nos. 164 ¶¶ 40, 41; 173 ¶¶ 40, 41.) The Court has previously summarized the other facts underlying Plaintiffs' claims (*see generally* ECF No. 104); thus, the Court discusses in detail here only the facts in the present record that are relevant to the pending Motions and where appropriate throughout this Opinion.

### b.  **Prior Motions for Summary Judgment**

On May 2, 2016, Defendants moved for summary judgment on Plaintiffs' due process claims and sought dismissal without prejudice of the remaining state law claims. (ECF No. 104, at 2; *see* ECF No. 96.) On March 24, 2017, the Court granted that prior Motion for Summary Judgment because it found that there was "no genuinely disputed issue concerning the fact that Plaintiffs lacked a constitutionally protected property interest in their jobs as police officers for the Borough of Worthington" and thus concluded that Plaintiffs could not establish their due process claims against the Borough. (ECF No. 104, at 21.) The Court also dismissed Plaintiffs state law claims at Counts Three and Four of each of their Second Amended Complaints because the Court

---

[2] As the SAC's state, what had been a state law claim at Count Two in each SAC was dismissed with prejudice by prior Order.

concluded that "no extraordinary circumstances exist[ed] as might compel the Court to retain supplemental jurisdiction over" those claims. (*Id.* at 22.)

In analyzing the prior Motion for Summary Judgment on Plaintiffs' federal claims, the Court concluded that Plaintiffs lacked a protected property interest under the Borough Code, 8 Pa. Stat. & Cons. Stat. §§ 101 *et seq.* (West 2022)[3] (*id.* at 9), which is one of the bases for due process protections that Plaintiffs assert in Count One of their Complaints (ECF Nos. 42 ¶ 76; 43 ¶ 37). The Borough Code provides that "[n]o person employed in any police . . . force of any borough may be suspended without pay, removed or reduced in rank except for" a reason specifically stated in the statute. 8 Pa. Stat. & Cons. Stat. § 1190. The statute defines "police force" as one in which the "members" of the police force "devote their normal working hours to police duty or duty in connection with the bureau, agencies[,] and services connected with police protection work and who are paid a stated salary or compensation for the work by the borough," and excludes certain police officers including "extra police serving from time to time or on an hourly basis." *Id.* § 1170. The Court concluded that Plaintiffs' status as part-time and hourly paid police officers "plac[ed] them squarely within the exception to civil service coverage contained in the Borough Code" and thus that the Borough Code's protections did not apply to them. (ECF No. 104, at 9.)

The Court also concluded that Plaintiffs lacked a protected property interest under the Police Tenure Act, 53 Pa. Stat. & Cons. Stat. §§ 811–816 (West 2022), which Plaintiffs had argued they necessarily must have if they are not entitled to the protections within the Borough Code. (ECF No. 104, at 14.) First, the Court reasoned that the Police Tenure Act does not apply to Plaintiffs or the Borough police force as it was constituted at the time Plaintiffs were terminated

---

[3] At all times relevant to this litigation, the pertinent provisions of the Borough Code were codified at 53 Pa. Stat. & Cons. Stat. §§ 46171–46195. The provisions that this Opinion discusses are identical in their prior and current locations in the statute. The Court cites to the current provisions throughout this Opinion for ease of reference.

from their positions, because the Borough's police force then consisted of four part-time members, and the Police Tenure Act only applies to police forces with less than three members, 53 Pa. Stat. & Cons. Stat. § 811, which the Court interpreted to mean less than three members whether employed part-time or full-time. (ECF No. 104, at 14–15 (citing *Mullen v. Borough of Parkesburg*, 572 A.2d 859, 861 (Pa. Commw. Ct. 1990)).) Second, the Court concluded that even if the Police Tenure Act did apply to Plaintiffs and the Borough's police force, Plaintiffs were not entitled to the Act's protections—which only apply to "regular full-time police officer[s]," 53 Pa. Stat. & Cons. Stat. § 812—because Plaintiffs were not actually available for full-time employment due to their admitted simultaneous employment with other police forces, and thus were not "regular full-time police officers" under the Police Tenure Act. (*Id.* at 10–13, 15 (citing *Petras v. Union Twp.*, 187 A.2d 171, 174 (Pa. 1963)).)

### c.   Appeal, Certified Question to Pennsylvania Supreme Court, and Remand

On April 21, 2017, Plaintiffs appealed this Court's Order granting Defendants' prior Motion for Summary Judgment. (ECF No. 106.) On appeal, the Court of Appeals panel, "believe[ing] the appeal raise[d] an important and unresolved question concerning the proper interpretation of" the Borough Code and the Police Tenure Act, "unanimously agreed to certify [a] question [on that subject] to the Supreme Court of Pennsylvania." *DeForte v. Borough of Worthington*, No. 17-1923, 2018 WL 8868017, at *1 (3d Cir. Apr. 19, 2018). The question that the Third Circuit certified to the Supreme Court of Pennsylvania was:

> Whether, under Pennsylvania law, (1) the Pennsylvania Borough Code and the Police Tenure Act must be read *in pari materia*, such that every legally authorized police force in Pennsylvania fall under the governance of one of those two state statutes, and (2) if not, whether the same test should be used to determine whether the Tenure Act's two-officer maximum and the Borough Code's three-officer minimum is satisfied.

*Id.* at *4.

4

In its Opinion answering the certified question, the Supreme Court of Pennsylvania framed the inquiry as "whether the same officer-counting methodology should be used for both enactments 'such that' all borough police forces fall under the governance of one of those two state statutes," and answered that inquiry in the affirmative. *DeForte v. Borough of Worthington*, 212 A.3d 1018, 1022–23 (Pa. 2019) As for the officer-counting methodology to be employed, the court stated that "'members' of a police force are individuals who 'devote their normal working hours to police duty or duty in connection with the bureau, agencies[,] and services connected with police protection work, and who are paid a stated salary or compensation for such work by the borough,'" concluding that the Borough Code's definition of members of a police force also applies to the Police Tenure Act. *Id.* at 1025–26 (quoting 8 Pa. Stat. & Cons. Stat. § 1170).

The Pennsylvania Supreme Court did not define the term "normal working hours" or explain what "devot[ing] [one's] normal working hours" to police duty and the related work entails. However, that court stated that "an hourly wage is a form of compensation," such that a police officer who is paid an hourly wage, like DeForte and Townsend were when employed as police officers by the Borough, is "paid a stated salary or compensation for [their] work by the borough." *Id.* at 1025.

The state Supreme Court also explained that while all borough police forces, including the Borough of Worthington's police force, must be governed by either the Borough Code or the Police Tenure Act, "the question of whether the applicable enactment ultimately provides Plaintiffs with procedural safeguards is distinct from the issue of whether Plaintiffs were 'members' of the Borough's police force for purposes of determining whether it had at least three members," such that the Borough Code applies, or fewer than three members, such that the Police Tenure Act applies. *Id.* In other words, all borough police forces in Pennsylvania are governed by exactly one

of either the Borough Code or the Police Tenure Act, but it does not follow that all police officers within a borough police force are entitled to the procedural safeguards contained in the applicable statute. Further, the court noted that "under *Petras* and the cases on which it relied, the fact of working part time is not dispositive" of the issue of whether a police officer is entitled to civil service protections under the governing statute. *Id.*; *see Petras*, 187 A.2d at 173–174 (explaining that being a "regular full time police officer" within a police force governed by the Police Tenure Act, and thus qualifying for procedural safeguards under that Act, does not require working a certain number of days or hours, but rather requires being "available for full employment, that is[,] on call at any and all times" (internal quotation marks omitted)).

Finally, the Supreme Court also emphasized that the exclusion from the Borough Code's provisions for "extra police serving from time to time or on an hourly or daily basis"—which this Court concluded in its Opinion granting Defendants' prior Motion for Summary Judgment that Plaintiffs should be characterized as—should be read such that "the modifier, 'serving from time to time or on an hourly [or daily] basis,' applies only to 'extra police'" and not "to part-time officers who are not 'extra police.'" *DeForte*, 212 A.3d at 1024. "Extra police are officers 'employed by municipalities to perform only limited duties and are needed in a municipality during certain limited hours to complement the regular police force.'" *Id.* The state Supreme Court noted that the record in this case "only indicate[d] that Plaintiffs were part-time officers" and "d[id] not suggest that Plaintiffs were extra police," and thus concluded that the "extra police" exclusion is inapplicable to Plaintiffs. *See id.*

Upon reviewing the Pennsylvania Supreme Court's answer to its certified question, the Third Circuit panel "conclude[d] that William DeForte and Evan Townsend *may* have a property interest that is sufficient to support their respective procedural due process claims." *DeForte v.*

*Borough of Worthington*, 776 F. App'x 781, 782 (3d Cir. 2019) (emphasis added). Accordingly, on September 5, 2019, our Court of Appeals vacated this Court's Order granting Defendants' prior Motion for Summary Judgment and remanded the case for further proceedings in this Court. *Id.* (ECF No. 108.)

### d.  <u>Pending Motions for Summary Judgment</u>

After the case was remanded to this Court, the parties engaged in fact discovery, and on September 30, 2020 Defendants filed the now pending Motions for Summary Judgment on all claims,[4] one Motion as to each Plaintiff (ECF Nos. 165, 167), and briefs in support of those Motions (ECF Nos. 166, 168). Plaintiffs filed a Brief in Opposition. (ECF No. 176.) Defendants filed a Reply Brief in support of both Motions (ECF No. 179), and Plaintiffs filed a Sur-Reply (ECF No. 183).

As to Plaintiffs' federal due process claims, Defendants argue that Plaintiffs lacked a protected property interest under either the Borough Code or the Police Tenure Act. Defendants begin by asserting that the Police Tenure Act, and not the Borough Code, applies to the Borough police force as it existed when Plaintiffs were terminated. (ECF Nos. 166, at 4; 168, at 4.) Recognizing that the Pennsylvania Supreme Court did not "provide any test for what is to be

---

[4] After the Third Circuit remanded the case to this Court, Defendants filed Motions for Partial Judgment on the Pleadings asking this Court to order judgment in Defendants' favor on Plaintiffs' state law claims, arguing that such was proper because (1) Plaintiffs' appeal to the Third Circuit had focused solely on the federal claims and was in Defendants' view a waiver of their state law claims, and (2) Plaintiffs never filed a protective suit in state court pending the federal appeal and thus the statute of limitations on their state claims had expired. *DeForte v. Borough of Worthington*, No. 13-356, 2020 WL 2487133, at *1 (W.D. Pa. May 14, 2020). The Court disagreed with both of Defendants' arguments, denied the Motions for Partial Judgment on the Pleadings, and concluded that the Third Circuit's vacatur of this Court's order imposing summary judgment on the federal claims implicitly reinstated the state claims. *Id.*

However, because the Court will grant Defendants' Motion for Summary Judgment as to Plaintiff DeForte in full on *res judicata* grounds, grant Defendants' Motion for Summary Judgment as to Plaintiff Townsend on Townsend's federal claim, and dismiss Plaintiff Townsend's state law claims on supplemental jurisdiction grounds, the Court does not address the parties' specific merits-based arguments as to Plaintiffs' state law claims in this Opinion.

considered devoting one's 'normal working hours to police duty,'" Defendants suggest that this Court equate "devoting one's 'normal working hours to police duty'" with working hours consistent with a full-time schedule, and they point to guidance from the U.S. Internal Revenue Service and the Pennsylvania Department of Labor and Industry as to what constitutes full-time work. (ECF Nos. 166, at 4, 6–7; 168, at 4, 6–7.) Defendants then assert that "a review of 'working hours'" based on deposition testimony and the schedules of the four police officers employed by the Borough at the relevant time shows that three of the four officers worked hours that "are well below the more than 30 hours/week as a benchmark for full-time work" and thus did not "devote their normal working hours" to the force such that they were "members" of a police force. (ECF Nos. 166, at 7–8; 168, at 7–8.) Thus, Defendants argue, the Borough police force had at most one "member" (DeForte) at the time Plaintiffs were terminated and as such was governed by the Police Tenure Act, which applies to borough police forces with less than three members. (ECF Nos. 166, at 7–9; 168, at 7–9.)

After asserting that the Police Tenure Act applies, Defendants then also argue that neither Plaintiff was a "regular full time police officer" under the Act such that he was covered by that statute's civil service protections. (ECF Nos. 166, at 9–11; 168, at 9–11.) Defendants point to this Court's Opinion granting Defendants' prior Motion for Summary Judgment, in which the Court determined that Plaintiffs were not "regular full time police officer[s]" because their work for other police forces prevented them from being actually available for full time work with the Borough police force, which meant that they did not meet the "actual availability" test for being a "regular full time police officer" that the Pennsylvania Supreme Court had previously established in *Petras*. (ECF Nos. 166, at 10; 168, at 10 (each citing ECF No. 104, at 12–13).) Defendants assert that Plaintiffs' deposition testimony, taken as part of discovery after the Third Circuit vacated this

Court's Opinion granting the prior Motion, confirms that the record now before the Court still reflects those facts on which the Court based its conclusion that Plaintiffs were not "regular full time police officer[s]."

Unlike Defendants, Plaintiffs in response do not perform any counting of "members" of the Borough's police force based on the "normal working hours" test to answer the threshold question of whether the Borough Code or the Police Tenure Act applies in this case. Plaintiffs appear to simply suggest that the Police Tenure Act applies because they focus on arguing that they were protected as "regular full time police officer[s]," a status that is relevant specifically in the Police Tenure Act context. (*See* ECF No. 176, at 8; 183, at 4–6.) In focusing only on the question of whether Plaintiffs were entitled to civil service protections under the Police Tenure Act, Plaintiffs do not clearly articulate their proposed meaning of "devot[ing] [one's] normal working hours" to police duty and related duties—i.e., being a "member" of a police force. To the extent that Plaintiffs address the meaning of being a "member" who "devote[s] [one's] normal working hours" to the police force, they seem to equate that status with being a "regular full time police officer." (*See* ECF No. 176, at 8 ("In determining whether Plaintiffs are members of a police department . . . the definition of what constitutes full-time employment . . . [is] whether the Plaintiffs w[ere] available or on call for duty at any and all times."); 183, at 4 ("Both DeForte and Townsend in their affidavits state that they devoted their normal working hours to police work for the Borough of Worthington and that they were available and on call at all times.").)

Plaintiffs also assert that in the Pennsylvania Supreme Court's Opinion addressing the question certified to it by the Third Circuit, the Supreme Court recognized that the Borough Code and the Police Tenure Act taken together are "an expression of public policy to grant job tenure to all police employed by [] municipalities" in Pennsylvania regardless of the size or other

characteristics of those municipalities. (ECF No. 183, at 3.) Defendants disagree with this premise in Plaintiffs' Response, arguing instead that under the Pennsylvania Supreme Court's Opinion, "[w]hile all borough police officers in Pennsylvania are subject to one of the statutes, it does not follow that they are entitled to the protections of either particular statute." (ECF No. 179, at 3.) In this regard, the Defendants appear to accurately acknowledge that while one of the two statutes *applies* to every borough police department and officer in the Commonwealth of Pennsylvania, the state Supreme Court directly stated that the question of statutory coverage was separate and distinct from whether a given police officer in a given situation had an interest protected by whichever of the two statutes was applicable.

### e. DeForte's 2016 Action Against the Borough, Feeney, Gerald Rodgers, and Joseph Zandarski

In 2016, Plaintiff DeForte filed a separate lawsuit in this Court against multiple defendants, including those in this action, bringing claims arising from DeForte's termination from the Borough police force and some of the events that followed. *See Deforte v. Borough of Worthington*, 364 F. Supp. 3d 458, 475 (W.D. Pa. 2019), *aff'd*, 844 F. App'x 511 (3d Cir. 2021), docketed at 2:16-cv-0067 and 2:16-cv-113 in this Court ("2016 action"). That case concluded on March 4, 2021, when the Third Circuit affirmed this Court's order granting summary judgment against DeForte as to all claims and all defendants. *See DeForte v. Borough of Worthington*, 844 F. App'x 511, 513 (3d Cir. 2021).

This Court's opinion on the motions for summary judgment in that case described the general underlying factual background and the claims that DeForte advanced as follows:

> Plaintiff William DeForte was fired from his position as Chief of Police of Worthington Borough after failing to provide security for the town's annual Halloween Parade. The Pennsylvania State Police, acting on information provided by Borough officials, then investigated a series of suspicious firearms transfers, stolen police radios, and stolen cash from a prostitution sting operation. This

investigation ultimately led the Armstrong County District Attorney's Office to charge Plaintiff with multiple theft-related crimes. The charges were eventually dropped, and Plaintiff sued several Borough officials and the Pennsylvania State Police Corporal responsible for the investigation under federal and state law. Under Plaintiff's theory, the Defendants knowingly fabricated inculpatory evidence and ignored exculpatory evidence in an effort to destroy Plaintiff's career as a police officer. . . .

Plaintiff initiated this civil action at Docket Number 2:16-cv-0067 on January 14, 2016, bringing claims under 42 U.S.C. §§ 1983, 1985, 1986, 1988, and the Fourth and Fourteenth Amendments to the Constitution, as well as state law tort claims for malicious prosecution, abuse of process, and intentional infliction of emotional distress against Worthington Borough, Feeney, and Rodgers. In separate litigation in this Court at Docket Number 2:16-cv-113, Plaintiff brought the same set of claims against Corporal Zandarski.

*DeForte*, 364 F. Supp. 3d at 463, 475 (citations omitted).

On August 24, 2021, the Court directed the parties in the cases at issue in this Opinion (*i.e.*, 13-cv-356 and 13-cv-357) to file statements of position as to the impact of the Third Circuit's decision in the other case (*i.e.*, the 2016 action) on the Motions for Summary Judgment pending here. (ECF No. 188.) Specifically, the Court noted that "[g]iven that judgment [in the Third Circuit], some or all of the claims at issue in this case . . . may now be barred by principles of claim or issue preclusion." (*Id.*)

On October 19, 2021, Plaintiffs and Defendants filed their statements of position regarding the Third Circuit's decision in *DeForte v. Borough of Worthington*, 844 F. App'x 511 (3d Cir. 2021). (ECF Nos. 195, 196.) Plaintiffs asserted that that decision does not preclude Plaintiffs' claims in the action at issue in this Opinion under the doctrine of claim preclusion because (1) this action was filed before the 2016 action was filed, (2) the suits are based on different causes of action, and (3) the action at issue here involves one party, Townsend, who was not a party to or in privity with a party to the 2016 action. (ECF No. 195, at 4–6.) Defendants also asserted that the judgment in the 2016 action does not preclude Plaintiffs' present claims under claim preclusion—

specifically, Defendants assert that the causes of action in the two suits are different—but Defendants did argue that the judgment in the 2016 action nonetheless does have preclusive effect on Plaintiffs' pending state law claims under the doctrine of *issue* preclusion. (ECF No. 196, at 5–12 ("[T]he issues and supporting facts asserted in [the live action] have already been litigated in [the 2016 action], with final judgment having been rendered against Plaintiff.").)

With those filings and the complete briefing as to the pending Motions for Summary Judgment, the Motions are ripe for disposition.

## II.   <u>LEGAL STANDARD</u>

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(a) & (e)). To meet its burden, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989). Moreover, a party's labelling or characterizing a fact as "disputed" does not make it so—the record evidence

the opposing party points to must support the dispute of fact, whether through reasonable inference or otherwise. If the non-moving party's evidence merely is colorable or lacks sufficient probative force, summary judgment must be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. See *id.* at 250. "Where the record taken as a whole could not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587; *see Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009).

In reviewing the record evidence, the court draws all reasonable inferences in favor of the non-moving party. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "The line between reasonable inferences and impermissible speculation is often 'thin,' *Fragale & Sons Beverage Co. v. Dill*, 760 F.2d 469, 474 (3d Cir. 1985), but nevertheless is critical because 'an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment.'" *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014) (quoting *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n. 12 (3d Cir. 1990)). Any inference must follow directly from admissible evidence. See *Anderson*, 477 U.S. at 255.

It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. *See id.*; *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004). Although summary judgment may be granted based on affidavits, conflicts of credibility should not be resolved on a motion for summary judgment unless the opponent's evidence is "too incredible to be believed by reasonable minds." *Losch v. Borough of Parkesburg*, 736 F.2d 903, 909 (3d Cir. 1984) (quoting 6 Moore's Fed. Prac. ¶ 56.14(4)).

## III.   ANALYSIS

### a.   DeForte's Claims Are Barred by *Res Judicata*

The Court first concludes that Plaintiff DeForte's claims are barred by *res judicata*.[5, 6] Thus, the Court will grant Defendants' Motion for Summary Judgment as to DeForte in full on that basis.[7]

"[C]laim preclusion, referred to as *res judicata*, gives dispositive effect to a prior judgment if a particular issue, although not litigated, could have been raised in the earlier proceeding. Claim preclusion requires: (1) a final judgment on the merits in a prior suit involving; (2) the same parties

---

[5] Throughout this Opinion, this Court uses "*res judicata*" to refer to claim preclusion, *i.e.*, "true *res judicata*," and the Court uses "issue preclusion" to describe that specific doctrine that is separate from claim preclusion. *See* § 4402 The Terminology of Res Judicata, 18 Fed. Prac. & Proc. Juris. § 4402 (3d ed.) (citing *Kaspar Wire Works, Inc. v. Leco Eng'g & Mach., Inc.*, 575 F.2d 530 (5th Cir. 1978)) (explaining that the term "*res judicata*" can be both generally used to refer to both claim preclusion and issue preclusion and specifically used to refer only to claim preclusion, or "true *res judicata*").

[6] While Defendants did not move for summary judgment as to either Plaintiff on preclusion grounds and neither party discussed preclusion in their initial briefs as to the Motions for Summary Judgment, the Court concludes that it is appropriate for the Court to have raised and sought the parties' input on this issue before deciding the Motions and to ultimately grant the Motion for Summary Judgment as to DeForte on the basis of *res judicata*.

The Third Circuit "ha[s] suggested that *sua sponte* consideration of preclusion can be appropriate in certain circumstances." *Reaves v. Pennsylvania Bd. of Prob. & Parole*, 580 F. App'x 49, 51 n.1 (3d Cir. 2014) (citing *United States. v. 5 Unlabeled Boxes*, 572 F.3d 169, 175 (3d Cir. 2009)). In *Reaves*, the panel based its decision that "*sua sponte* action was proper" in part on the fact that "the same District Court adjudicated both matters." *Id.*

Outside of the Third Circuit, it has also "become increasingly common to raise the question of preclusion on the court's own motion." 18 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4405 (3d ed.); *see, e.g.*, *Consolidated Edison Co. of New York, Inc. v. Bodman*, 445 F.3d 438, 451 (D.C. Cir. 2006) ("[B]ecause interests of judicial economy are at stake in preclusion doctrines, courts retain the power to consider such doctrines sua sponte."); *Simmons v. Chatham Nursing Home, Inc.*, 93 F. Supp. 2d 1265, 1268 & n.3 (S.D. Ga. 2000), *aff'd* 252 F.3d 441 (11th Cir. 2001) ("*Res judicata* confers benefits on the judicial system and preserves respect for it. Since the earlier action was decided in this court, *res judicata* would be based on the court's own records and would establish continuity and respect for another judge's judgment. The plaintiff, however, was given an opportunity to show reasons why the action should not be dismissed on *res judicata* grounds."); *Boone v. Kurtz*, 617 F.2d 435, 436 (5th Cir. 1980) ("Dismissal by the court *sua sponte* on *res judicata* grounds . . . is permissible in the interest of judicial economy where both actions were brought before the same court.").

Because the 2016 action and the action now pending were before this Court and the parties were provided with a full opportunity to address preclusion issues, the Court concludes that it may consider the impact of preclusion doctrines—specifically, *res judicata*—on the pending Motions in order to resolve this matter most efficiently.

[7] As explained below, the Court will also grant Defendants' Motion for Summary Judgment as to DeForte, specifically as to his federal claim, on the independent basis that DeForte has not shown that there is a genuine dispute as to any material fact such that that the federal claim may proceed further.

or their privities []; and (3) a subsequent suit based on the same cause of action." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 276 (3d Cir. 2014) (quoting *Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc.—Pension Fund v. Centra*, 983 F.2d 495, 504 (3d Cir.1992)). "[T]he central purpose of the doctrine [] [is] to require a plaintiff to present all claims arising out [of] the same occurrence in a single suit. In so doing, we avoid piecemeal litigation and conserve judicial resources." *Id.* at 277.

Although courts' recitation of the *res judicata* elements often "refers to 'prior' and 'subsequent' actions or judgments to distinguish between the case that is the basis for application of claim preclusion and the case that may be precluded by the doctrine, the filing and completion of the cases need not be sequential." 18 James William Moore et al., Moore's Federal Practice—Civil § 131.31 (2022). For example, and as relevant here, even if the suit that resulted in a final judgment on the merits was filed *after* the other suit, the suit with a final judgment may still preclude claims in the suit that was filed first. *See Milbourne v. Masters*, No. 02-2122, 2006 WL 213522, at *3 n.7 (E.D. Pa. Jan. 25, 2006) (citing *Murphy v. Landsburg*, 490 F.2d 319, 323 (3d Cir.1973)) ("The fact that the Van Antwerpen Complaint"—which resulted in summary judgment in the defendants' favor—"was filed subsequent to the Original Complaint does not bar the application of *res judicata*."); *see also Burton v. Ozburn Hessey Logistic*, 615 F. App'x 84, 87 (3d Cir. 2015) (concluding that where two suits were filed, and thereafter the first suit resulted in a final judgment on the merits, "[t]he fact that [the plaintiff] filed her [] 2014 complaint before entry of judgment in the 2012 case had no effect on the application of *res judicata*"). The application of this rule in courts within the Third Circuit mirrors the approach in other circuits. *See* Moore's Federal Practice—Civil § 131.31 (citing cases from the Second, Fifth, Seventh, Ninth, and Eleventh Circuits) ("This rule is consistently followed in the federal courts.").

Thus, the Court considers whether its order granting summary judgment in favor of the defendants in the 2016 action in *Deforte v. Borough of Worthington*, 364 F. Supp. 3d 458, 475 (W.D. Pa. 2019), which the Third Circuit affirmed, 844 F. App'x 511 (3d Cir. 2021), has preclusive effect on any of the claims pending in this case, even though the 2016 actions was filed after the action now before the Court.

"[T]he law is clear that summary judgment is a final judgment on the merits sufficient to raise the defense of *res judicata* in a subsequent action between the parties." *Hubicki v. ACF Indus., Inc.*, 484 F.2d 519, 524 (3d Cir. 1973). As a result, this Court's 2019 order granting summary judgment to the defendants in the 2016 action is a final judgment on the merits, and that element of claim preclusion is satisfied. However, Plaintiffs contend that that judgment does not bar Plaintiffs' claims here because (1) the action at issue here was filed before the 2016 action, (2) the suits are based on a different cause of action, and (3) the action at issue here involves one party, Townsend, who was not a party to or in privity with a party to the 2016 action. (ECF No. 195, at 4–6.)

As to whether the actions involve the same parties or their privities, this element is clearly satisfied as to DeForte, since DeForte was a plaintiff in both actions. On the other hand, Plaintiffs are correct that as to Townsend, this element of claim preclusion is not satisfied. Townsend was not a party to the 2016 action—rather, DeForte was the only plaintiff in that case—so in order for the final judgment on the merits in that action to preclude Townsend's present claims, Townsend must be a privity of DeForte. To be privities, two parties must have a "close enough" relationship, which is usually the case only when the party to the case in which the final judgment on the merits was rendered "is a virtual representative of the non-party, or when the non-party actually controls the litigation." *Collins v. E.I. Dupont De Nemours & Co.*, 34 F.3d 172, 176 (3d Cir. 1994).

Plaintiffs that are named in a suit, like the action at issue in this Opinion, in which claims might be precluded as to some parties, but were not named in the suit that might preclude those claims— *i.e.*, "new plaintiffs" in the suit in which preclusion might apply— "have generally been successful in preventing the application of *res judicata* as to them, even if the causes of action are identical." *Adams v. Am. Bar Ass'n*, 400 F. Supp. 219, 226 (E.D. Pa. 1975).

Here, the record does not indicate that DeForte is "virtual representative" of Townsend, or that Townsend controlled the litigation in the 2016 action, such that DeForte and Townsend have the "close relationship" required to conclude that DeForte and Townsend are privities. *Collins*, 34 F.3d at 176. Further, Townsend falls squarely within the "new plaintiff" scenario articulated in *Adams*. Therefore, the Court concludes that *res judicata*, if it applies at all, would only bar DeForte's claims in the present action.

As to Plaintiffs' other arguments that *res judicata* does not bar the claims in this case, the Court concludes that those arguments lack merit. Under the framework consistently applied in federal courts, including courts within the Third Circuit, the timing of filing of two actions does not dictate whether *res judicata* applies; thus, the fact that the 2016 action was filed after the present action does not mean that the 2016 action and the final judgment on the merits in that action cannot preclude claims in this action. *See, e.g.*, *Milbourne*, 2006 WL 213522, at *3 n.7.

Further, the Court concludes that the causes of action in the 2016 action and this case are the "same" under the standards that apply in the Third Circuit as to that element of *res judicata*. Whether the two suits are based on "the same cause of action . . . turn[s] on the *essential similarity* of the *underlying events* giving rise to the various legal claims." *Blunt*, 767 F.3d at 277 (second emphasis added). "In analyzing essential similarity," courts in the Third Circuit "consider several factors: (1) whether the acts complained of and the demand for relief are the same . . . ; (2) whether

the theory of recovery is the same; (3) whether the witnesses and documents necessary at trial are the same . . . ; and (4) whether the material facts alleged are the same." *Id.* (alterations in original) (internal quotation marks omitted). While the extent of the overlap of the "demand for relief" and of the "theory of recovery" asserted in each suit is relevant in determining whether the cause of action is the same, "[i]t is not dispositive that a plaintiff asserts a different theory of recovery or seeks different relief in the two actions." *Id.*; *see, e.g.*, *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 261–62 (3d Cir. 2010) ("Here, although the [] factors point in both directions, the factual assertions are indistinguishable. . . . [T]he demand for relief [and the required testimony] is different in each case. . . . But this does not change the fact that the underlying assertions giving rise to each claim were the same.").

Consideration of these factors helps a court determine whether claims in the action in which final judgment has not been rendered, that were not brought in the action in which a final judgment on the merits occurred, *could have been brought* in that action that has been brought to judgment— for "res judicata bars not only claims that were brought in the [other] action, but also *claims that could have been brought*." *Blunt*, 767 F.3d at 277.

Applying the *Blunt* factors as to essential similarity to the actions involved here, the Court first considers the similarity of the acts complained of and material facts alleged. The only significant difference between the acts complained of and material facts alleged is that the 2016 action also complained of and alleged facts related to the Armstrong County District Attorney's prosecution of DeForte that occurred *after* DeForte's termination from his position as a Borough police officer. Otherwise, both actions are focused on (1) the Borough's alleged wrongful termination of DeForte and (2) the efforts by Feeney to retaliate against DeForte for DeForte's investigation into certain alleged misconduct by Borough officials, including Feeney, with such

18

efforts consisting of Feeney getting DeForte fired and Feeney attempting to frame DeForte for unlawful behavior within the Borough and/or Pine Township. In short, while the 2016 action expanded the facts alleged to support the claims asserted, DeForte's claims in this case were subsumed in that case.

The factual allegations in the 2016 action are more numerous and detailed, but aside from the allegations that relate to the commencement and conclusion of DeForte's criminal prosecution, the allegations underlying the 2016 action for the most part simply provide further detail as to the same allegations underlying the action at issue here.[8] For example, in the present action, DeForte alleges that "on October 30, 2012, Mayor Feeney appeared at Pine Township, went into the police department and, with no authorization from Chief DeForte removed certain belongings" (ECF No. 42 ¶ 62), and that "Mayor Feeney apparently advised both Pine Township and the State Police that there was stolen property that belonged to the Borough of Worthington at the Pine Township Police Department" (*id.* ¶ 63). Meanwhile, in the 2016 action, DeForte alleged that on October 30, 2012, "Mayor Feeney broke into the Pine Township Police Department," where he "took some AR-15 magazines [and other items] that he thought belonged to the Worthington Borough Police Department," "planted two brand new handheld radios that were the property of Worthington Police Department . . . at the Pine Township [P]olice [D]epartment so that Chief DeForte would be criminally charged with theft of the radios," and "search[ed] for . . . copies of [] firearms transfers in order to destroy them to insure Chief DeForte could be criminally charged" for firearm thefts (No. 16-cv-67, ECF No. 1 ¶¶ 123–24, 178–81.) Further, DeForte alleged "that Mayor Feeney successfully influenced the Pennsylvania State Police, and the Armstrong County District

---

[8] Mr. DeForte is a prolific repeater of his claims. He advanced substantially similar ones in *DeForte v. Blocker*, No. 2:16-cv-113, 2017 WL 1102655 (W.D. Pa. Mar. 24, 2017), *reconsideration denied*, 2017 WL 1862213 (W.D. Pa. May 8, 2017), *aff'd* , 844 F. App'x 511 (3d Cir. 2021); *see also*, *DeForte v. the Township of Pine*, No. 2:15-cv-171 .

Attorney's office to initiate criminal proceedings against Chief DeForte." (*Id.* ¶ 182.) Reading these portions of the Complaints in both actions in tandem thus demonstrates that the "certain belongings" that DeForte alleges in this action that Feeney removed from Pine Township's police department were the gun magazines and gun transfer documents identified in the 2016 action Complaint, and that Feeney's informing Pine Township and the State Police about the presence of Worthington property at Pine Township's police department followed Feeney's alleged planting of Worthington radios at Pine Township for the alleged purpose of having DeForte investigated by Pine Township and/or the State Police, claims reprised as to State Police defendants in *Deforte v. Blocker* at 2:16-cv-113.

In sum, as to the acts complained of and material facts alleged in both actions, the Court concludes that the acts complained of and material facts alleged in the present action are also those complained of and alleged in the 2016 action, and that the only additional acts complained of and material facts alleged in the 2016 action relate to the criminal prosecution of DeForte that concluded after the present action was filed. So the 2016 action and the final judgment that ended it are inclusive of the claims here, and then some.

The Court next considers the remaining *Blunt* factors as to essential similarity between the 2016 action and the present action. First, the demand for relief in both actions is identical—specifically, compensatory damages and equitable relief, including DeForte's reinstatement to his former position as Worthington Borough Police Chief. Next, the theories of recovery as stated in the two actions are different. In the 2016 action, DeForte asserts violations of his constitutional rights through fabrication of evidence, plus state law malicious prosecution, abuse of process, and intentional infliction of emotional distress claims; in the present action, DeForte asserts violation of his constitutional right to due process, as well a claim under the Pennsylvania Whistleblower

Law and a common law tortious interference with business relations claim.[9] Finally, the witnesses and documents necessary at trial would be the same in both actions, with those necessary for the 2016 action likely consisting of all of those necessary for the present action plus additional evidence related to DeForte's criminal prosecution. Thus, most of the *Blunt* factors demonstrate that the causes of action in the 2016 action and this action are the same.

Most importantly, the *Blunt* factors indicate that the claims in the present action could have been brought in the 2016 action, which means that *res judicata* bars those claims. *Blunt*, 767 F.3d at 277. In the 2016 action, DeForte could have brought the claims he brings in the present action based on all of the events and factual allegations underlying the 2016 action that he asserted in the 2016 Complaint and without needing to assert anything more or different. Specifically, in his Complaint in the 2016 action, DeForte stated: "[o]n November 5, 2012, [he] was terminated from his position as Chief of Police of Worthington Borough" (No. 16-cv-67, ECF No. 1 ¶ 12); "[o]n October 24, 2012, Chief DeForte confronted Mayor Feeney regarding [Feeney's] theft of radios from the fire company," "the improper citation practices," and Mayor Feeney's "us[e] [of] funding from the police grant . . . to purchas[e] traffic control lights" (*id.* ¶¶ 99–102); "Mayor Feeney [] planted two brand new handheld radios that were the property of Worthington Police Department . . . at Pine Township police department so that Chief DeForte would be criminally charged with theft of the radios" (*id.* ¶ 180); several days after Mayor Feeney's visit to the Pine Township police department, that department was disbanded (*id.* ¶ 126); and "Mayor Feeney successfully influenced the Pennsylvania State Police, and the Armstrong County District Attorney's office to

---

[9] DeForte was duty-bound to litigate his whole case against the same defendants in one case only, as he may not "split" his causes of action across several cases. *Walton v. Eaton*, 563 F.2d 66, 70 (3d Cir. 1977) (en banc); *Holliday v. Prime Care Med.*, 520 F. Supp. 3d 639, 644 (E.D. Pa. 2021); *Jarvis v. Matlin Patterson Glob. Advisers*, 867 F. Supp.2d 559, 563 (D. Del. 2012). Simply put, a party must, raise in one, and only one, lawsuit every ground for recovery arising from a single transaction or occurrence against a given party or parties, and a judgment resolves all the claims brought or which could have been brought.

initiate criminal proceedings against Chief DeForte" (*id.* ¶ 182). Based on those averments, in the 2016 action, DeForte could have brought his present claims that (1) he was wrongfully terminated without process he was due under the Constitution (No. 13-cv-356, ECF No. 42 ¶¶ 64–79), (2) he was discharged "in retaliation for making good faith reports of wrongdoing" by Mayor Feeney and others in the Borough (*id.* ¶¶ 80–88), and (3) Mayor Feeney purposely sought to damage DeForte's reputation and further opportunities for police work such his work as a Pine Township police officer (*id.* ¶¶ 89–106). Although DeForte had already filed the current suit by the time he brought the 2016 action, the Federal Rules of Civil Procedure would have provided a mechanism for DeForte to consolidate his claims in the two lawsuits that stemmed from the same cause of action. *See* Fed. R. Civ. P. 42(a). More directly, as set out above, they are fundamentally the same lawsuit advanced twice, arising from the same factual scenario, and the final judgment in the 2016 action reaches them all, once and for all. *Merritts v. Richards*, No. 19-1335, 2023 WL 2532055, at *7 (3d Cir. Mar. 16, 2023).

DeForte "split" his cause of action, and repeated his claims in this case in his 2016 action. The 2016 action went to a final, affirmed judgment against him. That judgment resolved all of the claims he brought, or could have brought, about the events he complained of against the Defendants, and therefore resolve and bar his claims here. Thus, because the Complaint in the 2016 action is essentially a repetition and expansion of the events and circumstances that underlie DeForte's SAC in this case and would have provided a basis for DeForte to bring the claims in this case as part of that action, the final judgment on the merits in the 2016 action bars DeForte's present claims by virtue of affirmed summary judgment in that case. *Res judicata* bars DeForte's federal and state law claims in the pending action and provides an independent basis on which the Court will grant Defendants' Motion for Summary Judgment as to all of DeForte's claims.

**b.  Beyond *Res Judicata*, DeForte's and Townsend's Federal Claims Fail on the Merits, and the Court Will Not Exercise Supplemental Jurisdiction over Townsend's State Law Claims**

For the reasons explained below, the Court also concludes that there is no genuine dispute of material fact regarding whether Plaintiffs DeForte and Townsend had constitutionally protected property interests in their employment with the Borough police force such that they can prevail on their claims that the Borough wrongfully terminated them without due process. Further, the Court concludes that no extraordinary circumstances exist that would support this Court's retention of supplemental jurisdiction over Townsend's state law claims (or over DeForte's state law claims, if the Court were not granting summary judgment to Defendants on those claims on *res judicata* grounds). Thus, the Court will: (1) grant Defendants' Motion for Summary Judgment as to DeForte's federal claim for the reason independent from *res judicata* that DeForte has not demonstrated that his federal claim can proceed further; (2) grant Defendants' Motion for Summary Judgment as to Townsend's federal claim because Townsend likewise has not demonstrated that his federal claim can proceed further; and (3) dismiss Townsend's state law claims without prejudice on supplemental jurisdiction grounds.[10]

**i.  Federal Claims**

Relying on to 42 U.S.C. § 1983, DeForte and Townsend each assert a claim that the Borough violated his procedural due process rights under the federal Constitution when the Borough terminated his employment as a Borough police officer without process. To establish a procedural due process claim, a plaintiff must demonstrate that "(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty or property, and (2) the procedures available to him did not provide due process of law."

---

[10] This would also occur as to DeForte's state law claims beyond their resolution via *res judicata* as stated above.

*Biliski v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 574 F.3d 214, 219 (3d Cir. 2009) (internal quotation marks omitted). The issue throughout this case has been and remains whether either Plaintiff had a property interest encompassed within the Fourteenth Amendment's protections that would have entitled the Plaintiff to certain process.

Whether a public employee has a property interest in his employment sufficient to establish a due process claim is a question of state law. *Hill v. Borough of Kutztown*, 455 F.3d 225, 234 (3d Cir. 2006); *see Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). Public employees in Pennsylvania have a property interest in their employment only if they can "establish a legitimate expectation of continued employment through either a contract or a statute." *Pipkin v. Pennsylvania State Police*, 693 A.2d 190, 192 (Pa. 1997).

### 1. <u>Protected Property Interest Under the Borough Code or the Police Tenure Act</u>

The first basis on which DeForte and Townsend assert that they had "legitimate expectation[s] of continued employment" with the Borough, and thus constitutionally protected property interests in their jobs as Borough police officers, is the Pennsylvania Borough Code. (ECF Nos. 42 ¶ 76 ("Prior to being terminated, the plaintiff had a constitutionally protected property interest in his job as [a Borough police officer] which arose from: a. The Pennsylvania Borough Code . . . ."); 43 ¶ 37 (same).) Despite not identifying the Police Tenure Act in their SACs as a potential basis for their property interests in their Borough police force employment, DeForte's and Townsend's Briefs in Opposition to Defendants' Motions for Summary Judgment as to each Plaintiff focuses on the Pennsylvania Police Tenure Act and seem to argue that the Police Tenure Act applied to the Borough police force at the time DeForte and Townsend were fired. (*See* ECF No. 176, at 7–9.) Given those arguments, and the Pennsylvania Supreme Court's holding that all borough police forces are governed by either the Borough Code or the Police Tenure Act (but only

one of them), *see DeForte*, 212 A.3d at 1023, the Court treats DeForte's and Townsend's claims at Count One of their SACs as invoking both the Borough Code and the Police Tenure Act as potential bases for their alleged property interests.

Because the Borough of Worthington's police force as comprised at the time of DeForte's and Townsend's terminations was necessarily governed by exactly one of either the Borough Code or the Police Tenure Act, the first step in the Court's analysis of whether either provided civil service protections to Plaintiffs is determining which statute applied at the time of their terminations and thus applies to the issues in this case. Next, the Court considers how what the state Supreme Court said was a distinct question of whether Plaintiffs were entitled to civil service protections under the applicable statute is implicated here.

### a.  <u>Applicable Statute</u>

The Pennsylvania Borough Code's civil service provisions apply to borough police forces consisting of three or more members, *see* 8 Pa. Stat. & Cons. Stat. § 1171, while the Police Tenure Act, including its civil service provisions, governs "each borough . . . having a police force of less than three members," 53 Pa. Stat. & Cons. Stat. § 811. In this Court's Opinion granting Defendants' prior Motion for Summary Judgment, the Court determined that the Borough's police force at the time Plaintiffs were terminated had four "members" as that term is used in the Police Tenure Act and that it also had less than three "members" as that term is used in the Borough Code. (*See* ECF No. 104, at 9–15.) However, the Pennsylvania Supreme Court has now explained that "member" has the same meaning in each statute—that is, a "member" of a police force is an individual who "devote[s] their normal working hours to police duty or duty in connection with the bureau, agencies[,] and services connected with police protection work and who [is] paid a stated salary or compensation for the work by the borough." 212 A.3d at 1022–27.

25

As Defendants accurately note, the Pennsylvania Supreme Court did not elaborate upon the meaning of that definition, except to note that an hourly wage constitutes "a stated salary or compensation." *Id.* at 1024–25. The police officers employed by the Borough at the time of Plaintiffs' terminations were all paid hourly wages, so they all satisfy that portion of the definition of a "member" of a police force. (ECF No. 164 ¶ 5.) Further, no party disputes that all of those officers performed "police duty or duty in connection with the bureau, agencies[,] and services connected with police protection work." Thus, the remaining unanswered question in this case is whether those police officers "devote[d] their normal working hours" to those duties.

As explained above, Defendants and Plaintiffs propose different meanings of the phrase "devoting [one's] normal working hours" to police work for the applicable police force. Defendants argue that "devot[ing] [one's] normal working hours" to work for a police force means working a number of hours consistent with "full-time" employment—specifically, a minimum of 30 hours per week (which Internal Revenue Service guidelines define as full-time hours). (ECF Nos. 166, at 5–7; 168, at 5–7.) Plaintiffs' position is less clear (to say the least), but they seem to suggest that "devot[ing] [one's] normal working hours" to work for a particular police work is equivalent to being a "regular full time police officer" as that latter phrase is used in the Police Tenure Act. (ECF No. 176, at 7–9.) Since police officers who work on a part-time basis can be "regular full time police officer[s]," *see Petras*, 187 A.3d at 173–4, Plaintiffs' proposed interpretation of "devot[ing] [one's] normal working hours" is inconsistent with Defendants' interpretation because Plaintiffs' interpretation would include police officers who work less than 30 hours per week but who are actually available for full-time employment, *i.e.*, able to report for duty on a full-time schedule if called upon to do so.

Each of these interpretations has some support in the limited case law that has considered

the Borough Code's language as to what constitutes a "member" of a police force. For example, in *Mariano v. Borough of Dickson City*, the District Court concluded that a part-time, hourly paid police officer was *not* a member of the police force because the officer was better characterized as "extra police serving from time to time or on an hourly or daily basis," a type of police officer excluded from the Borough Code's definition of "police force." No. 13-97, 2014 WL 5795679, at *5 (M.D. Pa. Nov. 6, 2014). According to the court in *Mariano*, only police officers who are actually employed on a full-time schedule could be considered members of a police force who "devote their normal working hours" to work for that particular police force. *See id.* The court relied on other district court cases that had reached the same conclusion. *Id.* (citing *Stevens v. Telford Borough*, 2014 WL 4056952, at *6 (E.D. Pa. Aug. 14, 2014); *Rosati v. Borough of Hellertown*, 1992 WL 396769, at *2–3 (E.D. Pa. Dec. 24, 1992)).

On the other hand, the court in *Risk v. Burgettstown Borough* reached the opposite conclusion: a part-time, hourly paid police officer was a member of the police force under the Borough Code and entitled to the Borough Code's removal procedures because he was available for police work at all times and "no evidence was presented that [his] duties placed him within the definitions of 'special police,' 'extra police,' or 'auxiliary policemen.'" No. 05-1068, 2008 WL 4925641, at *3–4 (W.D. Pa. Nov. 14, 2008), *aff'd*, 364 F. App'x 725 (3d Cir. 2010)). And several Pennsylvania Courts of Common Pleas reached the same conclusion as did the court in *Risk*, holding that a "regular full time police officer" who is available for full-time work is a "member" of a police force when the police force is subject to the Borough Code. *See Huntley v. Boswell Borough*, 1981 WL 387, at *4 (Pa. Com. Pl. 1981); *Ambrose v. Dupont Borough*, 1984 WL 2328, at *5 (Pa. Com. Pl. 1984).[11]

---

[11] The Third Circuit cited *Huntley* and *Ambrose* in its Opinion certifying the question to the Pennsylvania Supreme Court of whether the same method of counting "members" of a police force should be applied for the Borough Code

In considering Plaintiffs' and Defendants' arguments as to the meaning of the phrase "devote [one's] normal working hours," available case law interpreting the phrase, and the Third Circuit's framework for statutory interpretation, this Court concludes that the phrase equates to being a "regular full time police officer," which under *Petras* means being actually available for full-time police work and able report for police duty at any time if called upon to do so, 187 A.2d at 174.

The Third Circuit has explained that "[a]s in all cases in which we interpret a statute, . . . we look first to its language, giving the words used their ordinary meaning." *Pellegrino v. U.S. Transp. Sec. Admin.*, 896 F.3d 207, 216 (3d Cir. 2018) (citations and internal quotation marks omitted), *reversed in part on other grounds*, 937 F.3d 164 (3d Cir. 2019) (en banc). "We look to dictionary definitions to determine the ordinary meaning of a word. It is well settled, however, that a word must not be read in isolation but instead defined by reference to its statutory context[,] . . . the purpose . . . of the statute, and [] any precedents or authorities that inform the [definition]." *United States v. Husmann*, 765 F.3d 169, 173 (3d Cir. 2014); *see Pellegrino*, 896 F.3d at 216 ("In addition to the statutory language at issue, we consider the specific context in which that language is used, and the broader context of the statute as a whole." (internal quotation marks omitted)).

The Court first concludes that the ordinary meaning of the words in the phrase "devote [one's] normal working hours" supports an interpretation of that phrase other than Defendants' interpretation—that the phrase means working on a full-time basis. *Merriam-Webster* defines "normal" as "according to, constituting, or not deviating from an established norm, rule, or principle[;] conformed to a type, standard, or regular pattern[;] not abnormal[;] regular," and

---

and the Police Tenure Act. In the Third Circuit's view, those cases concluded that "the phrases 'normal working hours' and 'regular full time police officer' were intended [by the Pennsylvania legislature] to be read coterminously so that courts can more easily determine the size of a borough's police force" and so that every borough police force is governed by one of the two statutes. *DeForte*, 2018 WL 8868017, at *3.

"devote" as "to attach the attention or center the activities of (oneself) wholly or chiefly on a specified object, field, or objective[;] attach (oneself) to[;] set (oneself) on." *Normal*, *Merriam-Webster*, https://unabridged.merriam-webster.com/unabridged/normal (last visited Oct. 17, 2022); *Devote*, *Merriam-Webster*, https://unabridged.merriam-webster.com/unabridged/devote (last visited Oct. 17, 2022).

Applying those definitions, the ordinary meaning of "devote [one's] normal working hours" to police work for a borough appears to be an individual police officer's centering of the hours that that officer regularly works wholly or chiefly around work as a police officer for *that* borough. That meaning does not indicate a certain number of hours a person must work, *i.e.*, the number of hours typical for full-time employment—because regardless of the number of hours a person regularly works, that person can focus those hours on work for a particular job and employer.

The ordinary meaning of the phrase "devote [one's] normal working hours" to work for a police force is more consistent with Plaintiffs' interpretation that the phrase is equivalent to being a "regular full time police officer," in the sense that someone who works for a police force part-time can still devote his normal working hours to the force. But the phrase's ordinary meaning does not suggest that "devot[ing] [one's] normal work hours" to a particular employer requires being actually available for full-time work for that employer and actually able to work any hours required for that employer, because one who "chiefly" centers their hours around work for that employer but has other jobs simultaneously might not be available for full-time work for the employer but still "devote" their regular working hours to that employer as the term "devote" is ordinarily understood. *See Devote*, *Merriam-Webster*, https://unabridged.merriam-webster.com/unabridged/devote (last visited Oct. 17, 2022). In other words, while the ordinary

meaning of the phrase "devote [one's] normal working hours" is more consistent with Plaintiffs' interpretation of the phrase than with Defendants' interpretation, the ordinary meaning and Plaintiffs' interpretation are not an exact match.

However, the context of the Borough Code provisions containing the phrase "devote [one]'s normal working hours" strongly suggests that "devot[ing] [one]'s normal working hours" does entail being *actually available* for police work such that the person is actually able to work any hours required by the job. The phrase appears in the provision of the Borough Code that defines the terms "police force" and "fire apparatus operator" as used in the Borough Code's civil service provisions that apply to those entities and individuals.

As this Court wrote in its Opinion addressing the earlier Motion for Summary Judgment in this case, "police work, by its very nature, involves matters of public safety that are often dangerous, rapidly evolving, and inherently unpredictable." *DeForte*, 2017 WL 1102653, at *7. The same is true with fire protection work. The reality of police and fire protection work suggests that "devot[ing] [one]'s normal working hours" to that work requires actually being in a position to engage in the "dangerous, rapidly evolving, and inherently unpredictable" matters involved in such work on little or no notice. Even if a police officer or fire prevention worker spent most of his or her working hours in those positions for a particular police or fire department as compared to hours spent at other jobs held simultaneously, any limitation on that police officer's or fire prevention worker's ability to immediately respond to a critical police or fire situation to which that department responds significantly undermines or even eliminates that person's ability to "devote" their working hours wholly or chiefly around police or fire prevention work for that police or fire department.

In addition to the ordinary meaning and context of the phrase "devote [one's] normal

working hours," at least some of the cases interpreting that phrase also indicate that the phrase

equates to being a "regular full time police officer" as defined in *Petras*. The Court finds it

persuasive that decisions by Pennsylvania state courts have consistently reached that conclusion,

in addition to those federal courts reaching that same conclusion. *See Huntley*, 1981 WL 387, at

*4 ("[I]n order to qualify as a member of a borough police force for purposes of determining the

size of the force under the [Borough Code], a borough police officer must be regular full time

officer within the meaning of the Police Tenure Act who also meets the criteria of Borough

Code."); *Ambrose*, 1984 WL 2328, at *5 ("It is obvious that, if a determination is to be made

whether a case falls within the civil service provisions of the [B]orough [C]ode, on the one hand,

or within the provisions of the Police Tenure Act, on the other hand, a uniform method of

determination of the number of officers to be included in the 'police force' must be employed, and

we believe that the guidelines set forth in *Petras* [as to what it means to be a "regular full time

police officer"] are those to be applied."[12]); *Risk*, 2008 WL 4925641, at *4 (concluding that

"[w]hether the Police Tenure Act or Borough Code applies, [the plaintiff] was protected by the

seniority furlough provisions" because as a part-time and hourly paid police officer, he was both

a "member" of a police force under the Borough Code and a "regular part time police officer"

under the Police Tenure Act); *Risk v. Burgettstown Borough*, 364 F. App'x 725, 732 (3d Cir. 2010)

(affirming the district court in *Risk*, 2008 WL 4925641, and concluding that "regardless of whether

---

[12] The Court does not view this analysis by the Pennsylvania Court of Common Pleas as inconsistent with the Pennsylvania Supreme Court's holding in *DeForte* that the Borough Code language ("devot[ing] [one's] normal working hours" to police work) is the appropriate test for counting membership in a police force. The Supreme Court noted that the Police Tenure Act does not define "member," and that while the Act "only extends protections to full-time officers, [] it does not necessarily follow that only full-time officers should be counted as members." *DeForte*, 212 A.3d at 1025–26. Thus, having determined that the Police Tenure Act and the Borough Code should be read *in pari materia*, the Supreme Court used the definition of "member" contained in the Borough Code as the definition of "member" in both statutes. *Id.* at 1026. That analysis does not mean that the definition of "member" is different from the definition of "regular full time police officer," but rather means that it *could* be. The Court today concludes that they are in fact not different, as the did Pennsylvania's Court of Common Pleas in *Huntley* and *Ambrose*.

the [Police Tenure Act] or the Borough Code applies, . . . as a matter of law, [the plaintiff] was protected by the seniority furlough provisions").

Finally, the purpose of the Borough Code's civil service provisions that apply to police officers, considered in tandem with the purpose of the Police Tenure Act and its version of those provisions, supports the conclusion that "devot[ing] [one's] normal working hours" to police work for a particular police force has the same meaning as being a "regular full time police officer" within that force and that this interpretation is the most reasonable as compared to the alternative interpretations proposed. The Pennsylvania Supreme Court discussed the legislative intent behind the Borough Code and the Police Tenure Act in its Opinion answering the certified question by the Third Circuit in this case. The Supreme Court identified two of its prior decisions that had interpreted the statutes as collectively intended to provide civil service protections to all police officers engaged in "regular full-time" police work regardless of the number of "members" of that police force. *DeForte*, 212 A.3d at 1023–24 (citing *George v. Moore*, 147 A.2d 148 (1959); *Deskins v. Borough of W. Brownsville*, 131 A.2d 101 (1957)). This suggests that the civil service protections within those statutes are intended specifically for all "members" of police forces.

Interpreting "devote [one's] normal working hours" to mean something other than being a "regular full time police officer" does generate a potential question in light of the purpose of the Borough Code and Police Tenure Act as described by the Pennsylvania Supreme Court. If Defendants' interpretation of the phrase were correct—such that "devote [one's] normal working hours" means working hours typical of full-time work (Defendants propose 30 hours per week as that benchmark)—there would be a subset of borough police officers who are entitled to civil service protections but are not "members" of a police force under either statute. Specifically, in borough police forces consisting of less than three members—*i.e.*, less than three police officers

who work for the force at least 30 hours per week—police officers who work in those forces part-time but are actually available for full-time employment would be entitled to civil service protections as "regular full time police officer[s]" under the Police Tenure Act, but would not be considered "members" of any borough police force.

That state of affairs is not inherently problematic, since as the Pennsylvania Supreme Court has told us, "the question of whether the applicable enactment ultimately provides [borough police officers] with procedural safeguards is distinct from the issue of whether [those officers] were 'members' of the[ir] [b]orough's police force." 212 A.3d at 1025. However, the outcome of extending to non-members the civil service protections that the Pennsylvania legislature intended specifically to benefit only "members" of police forces would deviate from the purposes of the Borough Code and the Police Tenure Act as articulated by the Pennsylvania Supreme Court. The Supreme Court's *DeForte* opinion does not foreclose a conclusion that the "distinct" issues of (1) whether a police officer is a "member" of a police force and (2) whether that officer is entitled to civil service protections in the appliable statute ultimately do coincide. In this Court's view, that is the proper conclusion for all of the reasons explained above.

Having concluded that "devot[ing] [one's] normal working hours" to police work for a certain police force under the Borough Code means being a "regular full time police officer" of that police force as that phrase is used in the Police Tenure Act (*i.e.*, not necessarily working "full time" in a given workweek, but at least being capable of full-time employment with the police force such that the officer is "on call at any and all times" for the force, *Petras*, 187 A.2d at 174), the Court now applies that definition to the facts in the record to determine the number of members of the Borough's police force who "devote[d] [their] normal working hours" to work for that force.

The record reflects the following undisputed facts: (1) at the time DeForte and Townsend

was terminated, four police officers—DeForte, Townsend, Nicole Traister, and Gerald Rodgers—worked for the Borough police force (ECF No. 164 ¶ 5); (2) all of those officers were paid an hourly wage (*id.* ¶ 6); (3) while employed by the Borough as a police officer, DeForte was also simultaneously employed by both North Buffalo (PA) Township and Coraopolis (PA) Borough as a police officer (*id.* ¶¶ 10, 11); (4) while employed by the Borough as a police officer, Townsend was also employed by both North Buffalo (PA) Township and Rankin (PA) Borough as a police officer (*id.* ¶ 35); (5) while employed by the Borough as a police officer, Traister was also employed by North Buffalo Township as a police officer (*id.* ¶ 26); and (6) while employed by the Borough as a police officer, Rodgers was also employed by Kittanning (PA) Borough as a police officer (*id.* ¶ 19).[13]

Further, the record includes testimony by DeForte and Townsend—during depositions taken in discovery preceding these pending Motions for Summary Judgment, the discovery on which these Motions for Summary Judgment are based—as to the nature of their employment with the Borough and the impact that that employment had on their employment with other police departments, and vice versa.

In his deposition, DeForte testified that his employment with the Borough police force was his "primary" police job (ECF No. 164-1, at 69:19) and was "a priority" (*id.* at 72:6). "[B]eing the chief [of police] of Worthington," DeForte asserted, "[he] was on call for everything all the time" and "had to leave family functions" and "leave school several times" to attend to matters for the Borough police department. (*Id.* at 72:10–14.) While employed with the Borough police department, DeForte testified, he did not work "very many" hours for the Coraopolis or North Buffalo police departments. (*See id.* at 71:3–19, 87:21–23.) As to his North Buffalo employment,

---

[13] Defendants assert these facts in their Statement of Material Facts in support of their Motions for Summary Judgment, and Plaintiffs admit all of these facts. (ECF No. 173 ¶¶ 5, 6, 10, 11, 19, 26, 35.)

DeForte stated that "[i]t was understood that [his] primary job was Worthington and that [he] could leave North Buffalo to take care of anything [for] Worthington," that this understanding was "between the Chiefs" of the departments (i.e., DeForte and Jason Hufhand, Chief of Police of North Buffalo Township), and that the departments "had or were working on . . . a joint municipal agreement" as to DeForte being able to leave North Buffalo and attend to police work in the Borough whenever needed. (ECF No. 164-1, at 88:1–16.) But as to DeForte's Coraopolis employment, DeForte "ma[d]e the note that if anything happened in Worthington Borough, [he] could have left [his] Coraopolis position whenever [he] chose," and that "if [the Borough] wanted [him] there, [he] dropped everything [he] was doing and le[ft]," which "was one of the reasons why [DeForte eventually] had to stop working in Coraopolis." (*Id.* at 71:15–19, 147:6–10.)

Townsend, like DeForte, testified that his employment with the Borough police force "was always [his] primary . . . job." (ECF No. 164-2, at 42:22–23, 49:7–8). Townsend stated that as he "viewed" his employment with the Borough, he was "full time for [the Borough]" (*id.* at 41:3–4); that "in practice, . . . [he] would have gone to anything [required in the Borough at] any time" (41:12–13); and that "it was understood that [he] wa[s] on call 24 hours a day" for the Borough (*id.* at 34:6–21). While he testified that there was a "written policy that . . . required [him] to be on call 24/7 from Worthington Borough," referring to a "card" that was made for him when he "went through SWAT school" that "said that [he] w[as] [an] ERT member[]," Townsend's testimony indicates that the source of his "underst[anding] that [he] wa[s] on call 24 hours a day" was statements by DeForte and Mayor Feeney, rather than a written policy. (*Id.*) But Townsend also testified that he was "*full time* for North Buffalo," (emphasis added) and that as to both North Buffalo and Worthington Borough, "[i]f anything happened in any of those areas . . . , [he] would be there." (*Id.* at 41:3–6).

35

As to his North Buffalo employment Townsend testified that "there would be times where [he] would be working in North Buffalo and something would happen in Worthington," at which times "the state police would start to go out to [Worthington] and [] if [Townsend] was in North Buffalo [he] would also" go to the Borough but did so "on behalf of North Buffalo." (ECF No. 164-2, at 30:11–17.) Thus, according to Townsend, if he were working and on duty for North Buffalo and his police services were needed in the Borough, he might well travel there, but he would not be doing so as a police officer of the Borough, but as an on-duty North Buffalo police officer.

Further, Townsend said he also "w[as] 24/7 for Rankin Borough," and that this "24/7" on-call status was "especially" true in Rankin Borough because that borough "ha[s] a very high crime rate." (*Id.* at 41:14–18.) Townsend's deposition does not indicate how, when working a police shift in Rankin Borough, Townsend would be able to respond to police needs in Worthington Borough, and if so, in what capacity (i.e., on behalf of Rankin Borough or Worthington Borough).[14]

From the record described above, the Court concludes that at the most, only two (2) individuals employed as a Borough of Worthington police officer in October 2012, when DeForte and Townsend were terminated, "devote[d] [his or her] normal working hours" to the Borough's police force because neither DeForte nor Townsend was  a "regular full-time [Borough] police officer" who was actually capable of full-time employment for the Borough while simultaneously

---

[14] As noted, Nicole Traister and Gerald Rodgers were also employed as Borough police officers at the time DeForte and Townsend were terminated. However, unlike DeForte and Townsend, Traister and Rodgers were not deposed (or at least such deposition testimony is not reflected in the record). The record does not indicate the nature of Traister's and Rodgers's employment with the Borough as compared to their employment with other police departments and the impact that their employment with each police department for which they worked had on their availability to respond to Borough police matters on behalf of the Borough. The record contains a Declaration by Rodgers, which states that "[i]n calendar year 2012, [he] was also employed as a Patrolman in the Kittaning Borough Police Department" (ECF No. 169, at 2), which is an undisputed fact that the Court has already stated and which is reflected in Defendants' Statement of Material Facts and Plaintiffs' Response to that Statement. Thus, unlike the situation with DeForte and Townsend as explained below, it may or may not be that Traister and Rodgers were "regular full-time officers" for the Borough when their dual employment situation is analyzed. But as noted below, DeForte and Townsend were not.

employed by other police forces. Here's why.

As this Court previously stated in this case:

Whether or not actual conflicts [between DeForte's, Townsend's, Traister's, or Rodgers's work for the Borough police force and their work for other police forces] ever arose is not dispositive [of whether the officer was available for full-time work], . . . as the test is one of actual availability. Plaintiffs' self-serving assertion that they were always on call and available to serve the Borough is belied by the self-evident fact that police work, by its very nature, involves matters of public safety that are often dangerous, rapidly evolving, and inherently unpredictable. As Defendants suggest, it is legally unreasonable to conclude that either officer, if engaged in an emergency police situation in another municipality, would have been free to simply leave the situation in order to handle a less emergent situation in Worthington Borough.

*DeForte*, 2017 WL 1102653, at *7. That reality remains true now.

In their depositions described above, and consistent with their assertions earlier in this litigation, DeForte and Townsend each testified that his employment with the Borough was his "primary" job and that each of them was able at any and all times to respond to Borough police department matters on behalf of the Borough. However, even if the *Borough* expected DeForte and Townsend to be available and on call to serve the Borough at all times, neither DeForte nor Townsend would actually be able to respond to a Borough police need as a Borough police officer if that need arose during one of their working shifts with another police department. This is because the nature of the job as a police officer would not allow them to simply walk off the job in one community to immediately attend to a different job—unless an agreement existed between the Borough police force and every other police department for which DeForte and Townsend worked that would trump that reality, *and* the municipalities were actually physically close enough to one another to make such plausible. As noted below, to argue that such was the case with either of Coraopolis and Rankin is simply implausible.

DeForte's testimony indicates that such an agreement may have existed as to DeForte

specifically between the Borough and North Buffalo police departments. (ECF No. 164-1, at 88:1–16 (statement by DeForte that "[i]t was understood that [his] primary job was Worthington and that [he] could leave North Buffalo to take care of anything [for] Worthington," that this understanding was "between the Chiefs" of the departments, and that the departments "had or were working on . . . a joint municipal agreement" to this effect).)

Worthington and North Buffalo Township are 7.6 driving miles apart. Google Maps, *Driving Directions from Worthington, PA, to North Buffalo Township, PA,* www.google.com/maps, (last visited Mar. 29, 2023).[15] This could, in the Court's estimation, create a genuine issue as to whether DeForte was available for full-time employment with the Borough if the only police departments for which DeForte worked were those of the Borough and North Buffalo. However, DeForte was also employed by and working at the Coraopolis police department while he was employed by the Borough, and as to the Coraopolis police position, the record contains nothing more than DeForte's statement of his own understanding that "if anything happened in Worthington Borough, [he] could have left [his] Coraopolis position whenever [he] chose." (*Id.* at 71:15–19, 147:6–10.) The Court concludes that such evidence is insufficient to show that DeForte was actually available for full-time employment with the Borough while he was also employed as a Coraopolis police officer, *i.e.*, an officer for a police department for which there is no evidence of an agreement between that department and the Borough that would have even allowed DeForte to drop everything in Coraopolis to attend to Borough police matters and where such would actually be physically possible.

A party opposing summary judgment cannot rely on implausibilities to defeat the Motion

---

[15] A court can take judicial notice of distances between places. *See Gordon v. Lewistown Hosp.,* 272 F.Supp.2d 393, 429 n.34 (M.D. Pa. 2003) (citing Fed. R. Evid. 201) (holding a court can take judicial notice of driving distances disclosed on an internet mapping service); *Bond v. Solvay Specialty Polymers, USA, LLC,* 583 F. Supp. 3d 643, 646 (D.N.J. 2022). This Court does take such judicial notice here.

for Summary Judgment. *See Burton v. Teleflex Inc.*, 707 F. 3d 417, 425 (3d Cir. 2013)  (stating that "to prevail on a motion for summary judgment," the nonmoving party must present evidence "on which the jury could reasonably find for the [non-movant]" (citing *Jakimas v. Hoffmann–La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007))). DeForte's assertion that he could with no advance notice simply drop everything while on duty in Coraopolis, PA (located in Allegheny County, PA), and then race back over the 60.7 driving miles between Coraopolis to the Borough (located in Armstrong County, PA) at the drop of a hat easily meets the measure of untethered implausibility. Google Maps, *Driving Directions from Coraopolis, PA to Worthington, PA,* www.google.com/maps, (last visited Mar. 29, 2023).

Likewise, the record contains insufficient evidence to show a genuine issue as to whether Townsend was available for full-time employment with the Borough. Townsend's testimony about the nature of his employment with North Buffalo demonstrates that if Townsend was called to a Worthington Borough police matter while on a North Buffalo police shift, he would potentially respond to the matter, but would do so not as a Borough police officer, but instead only "on behalf of North Buffalo." (ECF No. 164-2, at 30:11–17.) Thus, in that situation, he would not even be working as a Borough police officer. But the testimony also shows that Rankin Borough where he worked "24/7" "had a high crime rate" (*id.* at 41:14–18), which makes the Court's observations about the nature of police work particularly true as to Rankin Borough (located in Allegheny County, PA) and makes it facially implausible if not wholly incredible that Townsend would have been able to suddenly leave Rankin Borough on no notice while on a Rankin police shift to report to duty in and on behalf of Worthington Borough, which is over 38 driving miles away. Google Maps, *Driving Directions from Rankin, PA, to Worthington, PA,* www.google.com/maps, (last visited Mar. 29, 2023). Like DeForte as to Coraopolis, there is no evidence in the record of any

agreement between the Worthington Borough police department and the departments in North Buffalo and Rankin Borough as to allocating Townsend's dual employment, including as to his ability to actually abandon his Rankin police duties without advance notice to respond to a Worthington Borough police emergency.

With the exception of DeForte's testimony as to the agreement between him and the Chief of the North Buffalo police department, DeForte's and Townsend's self-serving assertions that the Borough expected them to be available to report for Borough police duty at any time, no matter what, and that they could actually do so, do not create a plausible issue of fact as to whether DeForte and Townsend were *actually* "*available* for full employment" with the Borough, *i.e.*, *actually "on call at any and all times*" to respond to work for the Borough. On the present record, what was true before is true now: "it is legally unreasonable to conclude that either [DeForte or Townsend], if engaged in an emergency police situation in another municipality [with the possible exception of North Buffalo for DeForte], would have been free to simply leave the situation in order to handle a less emergent situation in Worthington Borough." *DeForte*, 2017 WL 1102653, at *7. The same may or may not apply as  to Traister and Rodgers, who were also employed by and worked shifts for police departments aside from the Borough police department and as to whom there is no record evidence of any arrangement as to their employment and actual physical availability for the Borough while on duty elsewhere.

Further, the conclusion that a police officer who is simultaneously employed by multiple police forces may not be a "regular full time police officer" for any force is based on *Petras*, which has never ceased to be good law throughout the history of this case. *See DeForte*, 212 A.3d at 1025 (reiterating *Petras*'s holding that under its test for what constitutes being a "regular full time police officer," working on a part-time versus full-time schedule is not dispositive). What *has* changed

since this Court's disposition of Defendants' prior Motion for Summary Judgment is the Pennsylvania Supreme Court's holding that "member" of a police force has the same meaning in the Borough Code as it does in the Police Tenure Act, and this Court's determination that being a "member" means being a "regular full time police officer." The Court thus draws upon its existing analysis and conclusion that a Borough police officer simultaneously employed by other police forces—without an agreement between those police forces that allows an officer to actually make himself or herself available for one of the police forces even if actively working and doing police work on a shift for another force, coupled with it being physically plausible to do so—is not a "regular full time police officer" and thus does not "devote [his or her] regular working hours" to police work for the Borough.

Because at most only two (2) of the police officers employed by the Borough police force in October 2012 "devote[d] their normal working hours" to work for the force (that is, perhaps Traister and Rodgers), the Borough police force on this record had less than three "members" at that time.[16] The Police Tenure Act applies to "each borough . . . having a police force of less than three members." 53 Pa. Stat. & Cons. Stat. § 811. Thus, the Police Tenure Act applies to this case.

### b. **Whether DeForte or Townsend Had a Protected Property Interest Under the Applicable Statute**

Under the Police Tenure Act, "[n]o person employed as a regular full time police officer in any police department of . . . any borough . . . within the scope of this [A]ct . . . shall be suspended, removed or reduced in rank except for" cause as provided for in the Act. *Id.* § 812. For

---

[16] While this result may seem unusual, the Court concludes that it is not so unusual as to be unreasonable, especially because interpreting the statutory language that yields this result as the Court has in this Opinion appears to the Court to be the only reasonable application consistent with statutes' ordinary meaning, context, and purpose. *See Haggar Co. v. Helvering*, 308 U.S. 389, 394 (1940). The fact that the Police Tenure Act applies to borough police forces with "less than three members" contemplates borough police forces with two, one, or zero "members," which as noted is a precise and defined term of art.

the reasons explained above, neither DeForte nor Townsend were a "regular full time police officer" for the Borough. Thus, the Police Tenure Act did not provide DeForte or Townsend with "a legitimate expectation of continued employment" as a Borough police officer such that either had a constitutionally protected property interest in that job. *Pipkin*, 693 A.2d at 193.

And because the reason for the Court's conclusion that Townsend was not a "regular full time police officer"—specifically, Townsend was not actually available for police work while simultaneously employed by other police forces—would also apply to DeForte, the Police Tenure Act also would not provide DeForte with a constitutionally protected property interest in his job with the Borough police force. Thus, the Court would grant summary judgment in favor of Defendants on DeForte's claims on this basis also, beyond their being barred by the doctrine of *res judicata*.

### 2.  Other Asserted Bases for a Protected Property Interest

In their SACs, DeForte and Townsend also assert that they had constitutionally protected property interests in their jobs as Borough police officers by virtue of the Pennsylvania Whistleblower Law, the Worthington Police Department Policy and Procedure Manual, and/or a Borough ordinance setting forth a progressive discipline policy. (ECF Nos. 42 ¶ 76; 43 ¶ 37.)

Neither Plaintiffs nor Defendants directly address those aspects of Plaintiffs' claim at Count One of their SACs in any of their briefing as to the pending Motions for Summary Judgment. However, in their prior Motion for Summary Judgment, Defendants asserted that there was no genuine issue of material fact on the record as it then existed as to whether the Worthington Police Department Policy and Procedure Manual and/or a Borough ordinance setting forth a progressive discipline policy provided DeForte or Townsend with a constitutionally protected property interest in their Borough police force jobs. (ECF No. 102, at 6–7.) This Court agreed then, and that remains

the case now.

As to the Worthington Police Department Policy and Procedure Manual, the Court explained that there was no evidence in the record that the Manual—which itself was absent from the record—demonstrated an intent by the Borough "to abrogate the default presumption" in Pennsylvania that public employees are employees-at-will, such that even if the Pennsylvania legislature had granted the Borough authority to abrogate that assumption (via, through example, the Borough Code or the Police Tenure Act), the Borough had done so. *DeForte*, 2017 WL 1102653, at *8–9. As to an alleged Borough ordinance related to progressive discipline, the Court concluded that Plaintiffs had not at that point produced any evidence beyond their allegations in their SACs—which the Court deemed conclusory—that such an ordinance existed (which Defendants denied) and did what Plaintiffs said it did. *Id.* at *10. And as to the Pennsylvania Whistleblower Act, the Court noted that while that law "affords covered employees a remedy for wrongful discharge, discrimination[,] or retaliation when undertaken with a specific, unlawful intent, it does not confer on at-will employees a constitutionally protected property interest in their continued employment." *Id.* (citation omitted).

To the extent DeForte and Townsend still assert a protected property interest on these grounds, the Court's Opinion as to Defendants' prior Motion for Summary Judgment explained why there was nothing in the record to support a claim of a due process violation on those grounds. *See id.* at *8–10. Plaintiffs have not pointed the Court to any new information that now exists in the present record that would move the needle as to the Court's conclusions in that Opinion on the prior Motion; rather, as noted, Plaintiffs do not even address this aspect of their claims in opposing the pending Motions to Dismiss.

Therefore, as with the Police Tenure Act, neither the Pennsylvania Whistleblower Law, the

Worthington Police Department Policy and Procedure Manual, nor a Borough ordinance setting forth a progressive discipline policy provided DeForte or Townsend with "a legitimate expectation of continued employment" as a Borough police officer such that he had a constitutionally protected property interest in that job. *Pipkin*, 693 A.2d at 192–93.

### ii.  <u>State Law Claims</u>

Having disposed of DeForte's and Townsend's federal claims, this Court must consider the invocation of supplemental jurisdictional over the remaining state law claims at Counts Three and Four of Plaintiffs' SACs.

Pursuant to 28 U.S.C. § 1367, a federal court may decline to exercise supplemental jurisdiction when it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). As a general matter, when all federal claims have been dismissed from the lawsuit, a district court should refrain from exercising supplemental jurisdiction, absent extraordinary circumstances. *Angeloni v. Diocese of Scranton*, 135 Fed. App'x 510, 515 (3d Cir. 2005). "In making its determination, the district court should take into account generally accepted principles of judicial economy, convenience, and fairness to the litigants." *Growth Horizons, Inc. v. Delaware Cnty.*, 983 F.2d 1277, 1284 (3d Cir. 1993) (internal quotation marks omitted). "A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009).

The Court concludes that no "extraordinary circumstances" exist such that the Court should invoke supplemental jurisdiction to retain jurisdiction over the state law claims in this case. Townsend, whose state law claims are not impacted by *res judicata* as were DeForte's, may bring his state law claims in state court if he chooses, and given the extensive discovery that the parties

have completed as to those state law claims, no significant or detrimental impact on "judicial economy, convenience, and fairness to the litigations" will occur by this Court dismissing those claims on supplemental jurisdiction grounds. *Growth Horizons*, 983 F.2d at 1284.

As to DeForte, his state law claims are barred by *res judicata*. But even were they not, they too would not remain in this Court, and as with Townsend's claims, would be dismissed here, and then addressed if at all in state court.

## IV.   **CONCLUSION**

For the reasons explained above, the Court will GRANT in full the Motion for Summary Judgment as to Plaintiff DeForte, GRANT the Motion for Summary Judgment as to Plaintiff Townsend in part, specifically as to Plaintiff Townsend's federal claim, and dismiss Plaintiff Townsend's state law claims without prejudice.

An appropriate Order will issue.


s/ Mark R. Hornak
Mark R. Hornak
Chief United States District Judge


Dated:  March 31, 2023
cc:      All counsel of record (via CM/ECF)